UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | * | |
| MSP RECOVERY CLAIMS, SERIES LLC | * | |
| and SERIES 17-04-631, a series of MSP | * | |
| Recovery Claims, Series LLC, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 18-cv-11702-ADB |
| | * | |
| PLYMOUTH ROCK ASSURANCE | * | |
| CORPORATION, INC. and THE | * | |
| PLYMOUTH ROCK COMPANY, INC., | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

      This lawsuit arises under the Medicare Secondary Payer provisions of the Medicare Act

("MSPA"), 42 U.S.C. § 1395y *et seq*.  Plaintiffs MSP Recovery Claims, Series LLC and Series

17-04-631 (together "MSPRC"), as the assignees of a Medicare Advantage Organization

("MAO"), bring a single claim against Defendants Plymouth Rock Assurance Corporation, Inc.

and The Plymouth Rock Company, Inc. (together "Plymouth"), automobile insurers, to recover a

Medicare beneficiary's medical expenses under the MSPA.  [ECF No. 1].[1]

      MSPRC initially brought this case, on August 13, 2018, as a putative class action.  [ECF

No. 1].  The Court struck all class allegations on July 18, 2019, [ECF No. 26], but denied

---

[1] This case is among many lawsuits that MSPRC and related or similar entities have commenced across the country under the MSPA's private cause of action, 42 U.S.C. § 1395y(b)(3)(A).  <u>See, e.g.</u>, <u>MSP Recovery Claims, Series LLC v. Hartford Fin. Servs. Grp., Inc.</u>, No. 20-cv-00305, 2022 WL 3585782, at *1 (D. Conn. Aug. 22, 2022) (noting that the case before it is "one of hundreds of lawsuits initiated by Plaintiff in district courts throughout the country[]").

Plymouth's motion to dismiss the remaining exemplar claim for failure to state a claim and for lack of subject matter jurisdiction, [id.].  After a lengthy discovery period, the parties filed competing motions for summary judgment on November 4, 2021.  [ECF No. 88 (MSPRC); ECF No. 91 (Plymouth)].  MSPRC has also moved to drop plaintiff Series 17-04-631 and defendant The Plymouth Rock Company, Inc. as parties.  [ECF No. 90].  On December 6, 2021, Plymouth also moved to strike an affidavit filed by MSPRC in support of its motion for summary judgment.  [ECF No. 103].  Oppositions and replies to these motions have been filed.  [ECF Nos. 99, 101–02, 104–07].

For the following reasons, Plymouth's motion to strike is <u>DENIED</u> in part and <u>GRANTED</u> in part; the motions for summary judgment are <u>DENIED</u>; and MSPRC's motion to drop parties is also <u>DENIED</u> in part and <u>GRANTED</u> in part.

## I.        MOTION TO STRIKE

Because the objection in the motion to strike affects the factual record to be considered when ruling on the summary judgment motion, the Court addresses it first.  Plymouth moves to strike the affidavit of Dr. Manual Gonzales Brito, D.O. ("Dr. Brito"), [ECF No. 103], submitted by MSPRC in support of its motion for summary judgment.  [ECF No. 89-10 ("Brito Aff.")].  Dr. Brito is MSPRC's Chief Medical Officer charged with overseeing its medical team.  [ECF No. 106 at 1; Brito Aff. ¶¶ 5, 8].  Plymouth asks the Court to strike his affidavit because it constitutes an untimely and improper expert opinion that has not been previously disclosed.  [ECF No. 103].  MSPRC responds that Dr. Brito's testimony has not been proffered as an expert opinion, but as that of a fact witness, whose testimony is not subject to the heightened discovery requirements of expert witnesses.  [ECF No. 106].

Under Federal Rule of Civil Procedure 26, an "expert" "refer[s] to those persons who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical, and other specialized matters." Fed. R. Civ. P. 26(a)(2) advisory committee's note to the 1993 amendments. A party that seeks to offer expert testimony has additional disclosure requirements under Rule 26(a)(2), including the production of a written report for any "witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." Gomez v. Rivera Rodriguez, 344 F.3d 103, 112–13 (1st Cir. 2003) (citing Fed. R. Civ. P. 26(a)(2)(B)).[2] Failure to identify a witness under Rule 26(a) or meet its production requirements bars that party from using that information or witness "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. Rule 37(c)(1).[3] Plymouth argues that MSPRC's failure to disclose Dr. Brito's testimony before the deadline for expert disclosures set by this Court, see [ECF No. 60 (setting expert disclosure deadline as July 5, 2021)], requires the Court to strike his affidavit from the record at this stage. [ECF No. 103 at 2, 4].

Although MSPRC maintains that they have not designated Dr. Brito as an expert witness, "the triggering mechanism for application of Rule 26's expert witness requirement is not the status of the witness, but, rather, the essence of the proffered testimony." Gomez, 344 F.3d at 113 (citing Patel v. Gayes, 984 F.2d 214, 218 (7th Cir. 1993) and Fed. R. Civ. P. 26(a)(2) advisory committee's note to the 1993 amendments). MSPRC argues that that Dr. Brito's

---

[2] "Such a witness must submit a written report containing, inter alia, detailed information as to the qualifications and intended testimony of the witness." Gomez, 344 F.3d at 113 (citing Fed. R. Civ. P. 26(a)(2)(B)).

[3] "Although Rule 37(c)(1) is traditionally invoked to preclude expert testimony at trial, it can also be applied to motions for summary judgment." Poulis-Minott v. Smith, 388 F.3d 354, 358 (1st Cir. 2004) (citation omitted).

testimony is offered only to corroborate the testimony of MSPRC's Chief Information Officer, Christopher Miranda ("Miranda") about (1) the process by which claims are identified and reviewed by the medical team; (2) the review of A.C.'s claims by the medical team; and (3) the fact that the treatment rendered to A.C. was related to the motor vehicle accident.  [ECF No. 106 at 1, 6–8].

Despite MSPRC's contentions to the contrary, Dr. Brito's third category of testimony veers into the province of an expert.  MSPRC asserts that Dr. Brito need not have been disclosed as an expert because, in his role as Chief Medical Officer, he "played a personal role in the unfolding of the events at issue and the anticipated questioning seeks only to elicit the witness's knowledge of those events."  [ECF No. 106 at 3–4 (quoting Gomez, 344 F.3d at 113–14 (citation omitted))].  Fact witnesses can only testify to their first-hand experience of the events at issue and to "personal knowledge acquired before any litigation had begun."  Gomez, 344 F.3d at 113. The most common example is the treating physician, who has specialized knowledge, but does not need to be considered an expert under Rule 26 when testifying about their consultation or treatment of a specific patient, see id., as long as "[their] opinion testimony arises not from [their] enlistment as an expert but, rather, from [their] ground-level involvement in the events giving rise to the litigation," Downey v. Bob's Disc. Furniture Holdings, Inc., 633 F.3d 1, 6 (1st Cir. 2011); see also Gonzalez v. Exec. Airlines, Inc., 236 F.R.D. 73, 78–79 (D.P.R. 2006) (explaining that the treating physician's lay testimony "must be closely constrained to the facts of the treatment administered and discussed in his notes at the time of the examination" and limited "to those opinions [he] formed and relied on during the course of [his] examination and/or treatment of the patient." (citations omitted)).

Dr. Brito's affidavit, however, which makes several conclusions about the causal relationship between A.C.'s treatments and services and the car accident, plainly reflects that Dr. Brito had no role in reviewing any data related to A.C. prior to the start of this litigation.

Instead, the testimony reflects that Dr. Brito arrived at his opinion through examining data obtained from the litigation:

> For this case, and as part of MSP's standard practice, I reviewed data and reports from the MSP System relating to the Medicare beneficiary, A.C., which I understand was alleged in the above-captioned matter. Specifically, I reviewed the following materials in developing my opinion in this case: Ability reports; medical and prescription claims data; medical records; transactional data and the Deposition of Christopher Miranda.

[Brito Aff. ¶ 7]; see also [id. ¶ 10].  He then opines on the connection between the car accident and the medical services rendered to A.C., opinions he explicitly describes as formulated based on these materials and his expertise:

> Accordingly, based upon my review of these materials, and also based on my education, training, experience expertise and my knowledge of the facts of these cases, it is my opinion with a reasonable degree of medical probability that the care rendered to A.C. was medically necessary and reasonable as a result of an accident.

> *  *  *

> Based on my experience in the medical field as a physician, the diagnosis codes and the medical items and services are directly related to A.C.'s automobile accident.

[Id. ¶¶ 9, 18].  There are no facts in Dr. Brito's testimony, or in that of Miranda, that suggest that Dr. Brito came to these conclusions in the regular course of his work, or that Dr. Brito even reviewed A.C.'s claim while the events underlying this case were unfolding.  Instead, he "comes to the case as a stranger and draws the opinion from facts supplied by others, in preparation for trial, [and thus] he reasonably can be viewed as retained or specially employed for that purpose, within the purview of Rule 26(a)(2)(B)."  Downey, 633 F.3d at 7 (citations omitted); see also

Engel v. Liberty Ins. Corp., No. 20-cv-00082, 2021 WL 1383234, at *5 (S.D. Ala. Apr. 12, 2021) ("[W]here employees have no connection to the specific events underlying the case, or have reviewed information solely in preparation for litigation, they must produce expert reports." (citation omitted)).  The Court, however, declines to strike the affidavit in its entirety, as portions of Dr. Brito's affidavit are admissible as firsthand, lay testimony, *i.e.*, testimony about MSPRC's regular business practices and customs and the medical team's process for identifying and reviewing claims generally.  See e.g., Nat'l R.R. Passenger Corp. v. Ry. Express, LLC, 268 F.R.D. 211, 216 (D. Md 2010) (boring machine operators testifying about the daily operations of the machines need not produce expert reports, but testimony from those same witnesses about the potential effects of a hypothetical safety precaution would require experts reports); St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc., No. 05-cv-02115, 2007 WL 1589495, at *13 (D.D.C. June 1, 2007), aff'd sub nom. Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc., 630 F.3d 217 (D.C. Cir. 2011) (insurance company employee could testify as a fact witness to "information he learned from his pre-litigation inquiries and receipt of information and materials" and calculations he made regarding the relevant claim, but he "may not offer his independent opinions regarding causation, or damages assessments made either after litigation commenced or independent of his assessment of damages as a function of his job as an insurance adjuster" (citation omitted)); Mann v. Cnty. of San Diego, No. 11-cv-00708, 2014 WL 12729300, at *3 (S.D. Cal. Feb. 12, 2014) (allowing contractors' lay testimony that was formulated during their contract work, but requiring reports for any testimony that "goes beyond such on-the-scene knowledge and observations").

 Accordingly, any opinions Dr. Brito offers about the relationship between the medical services rendered to A.C. and the car accident, and whether those services were medically

necessary and reasonable, are in "essence" previously undisclosed expert opinions and are therefore struck from the record, and the Court has not relied on those opinions in consideration of the summary judgment motions.

## II.      FACTUAL BACKGROUND

Except as otherwise noted, the following facts are undisputed.[4]

MSP Recovery Claims, Series LLC is a company created, at least in part, to "own[] and pursue[] claims recovery and reimbursement rights assigned to [it] or any of its designated Series, by [MAOs]" and other authorized health care organizations and providers.  [ECF No. 105 ¶ 1].  Series 17-04-631 is one such series which "serve[s] as an assignee of . . . claims recovery and reimbursement rights[.]"  [Id. ¶ 2].

At issue in this case are rights MSPRC was assigned from Fallon Community Health Plan ("Fallon"), an MAO and a participant in the Medicare Program.  [ECF No. 102 ¶ 1].  The rights are related to the claims of a particular enrollee, "A.C.", stemming from a car accident.  [Id. ¶¶ 6–7].  Plymouth Rock Assurance Corporation insured the other driver involved in the accident.[5]  [Id.  ¶¶ 2–3, 6].  This automobile insurance policy included personal injury protection.  [Id. ¶ 4].  Metropolitan Property Insurance ("MetLife") was A.C.'s no-fault

---

[4] Unless otherwise noted, the Court draws the facts from MSPRC's statement of undisputed material facts, [ECF No. 89], and Plymouth's response, [ECF No. 102], and Plymouth's statement of undisputed material facts, [ECF No. 93], and MSPRC's response, [ECF No. 105], and the documents referenced therein.  Citations to paragraph numbers refer to both the asserted fact and the response.

[5] It is now undisputed that defendant Plymouth Rock Company, Inc. is a parent and holding company and is not engaged in the insurance business, and, as will be discussed further below in Section IV, it is dismissed from the case.  [ECF No. 105 at 6–7].

personal injury protection insurer at the time of the accident.  [ECF No. 105 ¶¶ 24, 41].

### A.    Underlying Claims

On April 12, 2012, A.C. was involved in a car accident, while backing out of parking spot at a grocery store in Massachusetts, with a driver ensured by Plymouth.  [ECF No. 102 ¶ 6; ECF No. 105 ¶ 22].  MSPRC asserts, and Plymouth disputes, that at the time of the accident, A.C. was a Medicare beneficiary enrolled in a Medicare Advantage (or "MA") plan under Medicare Part C issued and administrated by Fallon.  [ECF No. 102 ¶ 7].[6]  The accident reports prepared by both drivers stated that A.C. was insured by Metlife.  [ECF No. 105 ¶ 24].

Four days after the accident, on April 16, 2012, A.C. visited her primary care physician, Dr. Kathleen O'Grady, complaining of an upper respiratory infection and right shoulder pain.  [ECF No. 105 ¶ 25; ECF No. 93-16 (A.C. medical record)].  She reported an "inability to move her [right] shoulder" and was diagnosed with a "contusion" of the right shoulder.  [ECF No. 105 ¶ 26; ECF No. 93-16 (A.C. medical record) at 2–3].  Dr. O'Grady's report further notes that an X-ray on the shoulder was negative and that A.C. thought "she may have braced herself with her [right] arm during the accident. Has a history of [right] shoulder problems. Was doing well after a course of [physical] therapy. Arm feels week. Shoulder hurts with active . . . [range of motion] overhead. No hand paresthesia. No hand weakness."  [ECF No. 105 ¶ 26 (third and fifth alterations in original)]; see also [ECF No. 93-16 (A.C. medical record)].  The records show that her right shoulder was treated with a course of physical therapy and that it was later diagnosed as a rotator cuff tear, but she was advised against surgery as further treatment.  [ECF No. 105 ¶¶ 28–29; ECF No. 93-16 (A.C. medical record)].

---

[6] Plymouth asserts that A.C. was only Medicare eligible at the time of the accident in April 2012. [ECF No. 102 ¶ 7].

MSPRC alleges, and Plymouth emphatically disputes, that A.C.'s healthcare providers ultimately charged Fallon $2,059.95 for medical treatments and services required to treat her injuries from the accident.  See [ECF No. 102 ¶ 11]; see also [ECF No. 102 ¶¶ 8–10 (listing alleged items and services); ECF No. 89-6 (claims data spreadsheet); ECF Nos. 89-3, 89-7, 89-8, 89-9, 89-16, 89-33 (records reflecting medical bills and services)].  According to MSPRC, it reviewed various diagnostic and treatment codes in Fallon's claims data that reflect medical services rendered to A.C. as a result of the accident; Plymouth asserts that this fact is unsupported and that MSPRC cannot use diagnostic codes alone to determine whether the medical treatment was reasonable, necessary and casually related to the car accident.  [ECF No. 102 ¶¶ 8–10]; see also [ECF No. 89-6].  In the claims data spreadsheet, [ECF No. 89-6], the column titled "PAID_AMT" reflects "0.00" in all cells, which MSPRC says is due to payments made pursuant to a capitation agreement for A.C.'s accident-related expenses whereby the provider is paid a fixed monthly payment per beneficiary, but Plymouth asserts it is evidence that Fallon did not pay anything for A.C.'s accident-related expenses and that no such capitation agreement existed.  [ECF No. 102 ¶¶ 12–13]; see also [ECF No. 89-7 at 4 (medical bills from Dr. Kathleen O'Grady/Reliant Medical Group reporting payments by "FCHP CAP Contractual Allowance W/O"); ECF No. 89-16 at 2 (medical records from Dr. Gary Peters identifying A.C.'s insurer as "FCHP Capitated Medicare" and "FCHP Cap Senior Plan")].  Both Miranda, MSPRC's Chief Information Officer, and Fallon's Senior Vice President and Chief Operating Officer, Emily West ("West"), testified that a capitation agreement existed between Fallon and providers.  [ECF No. 89-11 (Miranda Decl.) ¶¶ 30–31; ECF No. 89-12 (West Decl.) ¶¶ 13–20].  Plymouth maintains, and MSPRC disputes, that it was

not Fallon, but Metlife, A.C.'s personal injury insurer, who paid for all of her treatment related to the accident.  [ECF No. 102 ¶¶ 11, 13; ECF No. 105 ¶¶ 41–52].

After the accident, A.C. made a claim against the other driver's liability insurance policy with Plymouth.  Plymouth received A.C.'s accident-related medical records from her treating doctors at Reliant Medical Group by October 8, 2014, [ECF No. 102 ¶ 15], from MetLife by March 13, 2015, [id. ¶ 16], and from Dr. O'Grady by March 18, 2015, [id. ¶ 17].  These purported accident-related medical records start on April 13, 2012, the day after the accident, and end on January 23, 2013.  [ECF No. 105 ¶¶ 45, 54].

On or about August 27, 2015, the Centers for Medicare and Medicaid Services ("CMS") advised Plymouth in writing that "Medicare has not paid any Part A or B Fee-for-Service claims related to [A.C.'s] case" and that "Medicare has no responsibility to pay for any claims related to the . . . case that were incurred from the date of the incident until the day after the case was finalized(settled)."  [ECF No. 105 ¶¶ 78, 79; ECF No. 93-29].  The letter makes no mention of Part C.  [ECF No. 93-29]

On April 6, 2015, Plymouth entered into a settlement agreement with A.C. in the amount of $20,000.00, in which A.C. agreed to release and indemnify Plymouth from all claims and demands stemming from the April 2012 car accident.  [ECF No. 102 ¶ 24; ECF No. 105 ¶¶ 74–75; ECF No. 93-28 (release and settlement)].  MSPRC says Plymouth did not notify Fallon of the settlement; Plymouth says there was a phone call between representatives of the two companies in January 2013 that was sufficient to notify Fallon of Plymouth's role and a potential settlement, and which gave Fallon the opportunity to notify Plymouth that it had a lien or that it was acting as an MAO.  [ECF No. 102 ¶ 26; ECF No. 105 ¶¶ 84, 86, 89–90].

Then, on June 12, 2018, and again on June 21, September 14, and December 14, and on January 15, 2019, MSPRC issued what it describes as "Notice of Lien demand letters" to Plymouth regarding A.C.'s accident with its insured, although Plymouth describes these as "boilerplate 'information request[s.]'" [ECF No. 102 ¶¶ 27–28]; <u>see also</u> [ECF Nos. 89-22, 89-23, 89-24, 89-25, 89-26]. It is undisputed that Plymouth did not directly notify MSPRC of the settlement with A.C. until January 15, 2019. [ECF No. 102 ¶ 29]; <u>see also</u> [ECF No. 89-27 (Jan. 15, 2019 Letter from Plymouth adjuster to MSPRC)]. MSPRC asserts, and Plymouth disputes, that Plymouth knew that A.C. was both a Medicare beneficiary and enrolled in a plan issued by Fallon prior to its settlement with A.C., and that it took no steps to notify Fallon of the settlement or to determine whether Fallon was entitled to reimbursement. [ECF No. 102 ¶¶ 21, 26]. Plymouth contends that at the time of the settlement it had no information that suggested that there was any other party involved that required payments since it believed MetLife had paid all of A.C.'s reasonable and necessary medical expenses. [ECF No. 105 ¶¶ 43, 44, 49, 52]. MSPRC disputes this and further asserts that the medical bills paid by MetLife are "entirely distinguishable" from the specific claims for which it is seeking recovery in this action. [<u>Id.</u> at 43–44, 49].

**B.    Assignment of Claims from Fallon to MSPRC**

On June 19, 2017, Fallon assigned all rights to recover conditional payments made on behalf of its enrollees for dates of service from June 19, 2011 through June 18, 2015 to MSP Recovery, LLC. [ECF No. 102 ¶ 32; ECF No. 105 ¶ 9; ECF No. 93-10]. On June 20, 2017, MSP Recovery, LLC assigned these rights to Series 17-04-631, [ECF No. 102 ¶ 34; ECF No.

105 ¶ 11; ECF No. 93-11].[7]  MSPRC asserts, and Plymouth disputes, that A.C.'s claim is among these assigned claims.  [ECF No. 102 ¶ 33].  The first recovery agreement contained a carve-out for any assigned claims in the two years prior to June 19, 2017 because of other contractual obligations.  [ECF No. 105 ¶¶ 13, 18; ECF No. 93-10 at 3].

Fallon and Series 17-04-631 executed a second assignment in June 2019.  [ECF No. 102 ¶ 36; 105 ¶ 15; ECF No. 93-12].  MSPRC asserts, and Plymouth disputes, that this second assignment assigned all Fallon claims up to June 29, 2019, including those initially excluded from the original assignment, to MSPRC.  See [ECF No. 105 ¶¶ 17–18; ECF No. 102 ¶ 33].

## III.  CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.  Legal Standard

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in original) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact

---

[7] MSP Recovery, LLC is Florida entity distinct from either plaintiff in this matter.  See [ECF No. 105 ¶¶ 9–10].  This Court already determined at the motion to dismiss stage that, though MSP Recovery Claims, Series LLC is not a party to the assignment, it has the right to pursue claims arising from the rights assigned to its series, including to Series 17-04-631, under its limited liability agreement and Delaware law.  [ECF No. 26 at 11]; MSP Recovery Claims, Series LLC & Series 17-04-631 v. Plymouth Rock Assurance Corp., Inc., 404 F. Supp. 3d 470, 480 (D. Mass. 2019); see also [ECF No. 102 ¶ 35].

either way." Id. (citation omitted).  By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case."  United States v. Plat 20, Lot 17, 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

> To succeed in showing that there is no genuine dispute of material fact, the moving party must . . . "affirmatively produce evidence that negates an essential element of the non-moving party's claim," or, using "evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial."

Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (second alteration in original) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party."  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (citation omitted).  That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact."  Plat 20, Lot 17, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)) (further citation omitted).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Cochran, 328 F.3d at 6 (citation omitted).  The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial."  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012) (citation omitted), and the Court may discount "conclusory allegations, improbable

inferences, and unsupported speculation[,]" <u>Cochran</u>, 328 F.3d at 6 (quoting <u>Medina-Muñoz v.</u>

<u>R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)).

### B.     Legal Framework for the Claim

This Court recites the following legal framework for the claim which is taken from its

ruling on Plymouth's motion to dismiss, including footnotes, [ECF No. 26]:

> Traditional Medicare consists of Parts A and B of the Medicare Act.  <u>See</u> 42 U.S.C. §§ 1395c – 1395w-6.  These fee-for-service provisions entitle eligible persons to have CMS pay medical providers directly for hospital and outpatient care.  <u>See id.</u> Medicare Part C is the Medicare Advantage program under which Medicare-eligible persons may elect to have an MAO such as Fallon, rather than CMS, provide Medicare benefits.  <u>See</u> 42 U.S.C. §§ 1295w-21 – 1395w-29.  Medicare Part D provides for prescription drug coverage, <u>see</u> 42 U.S.C. §§ 1395w-101 – 1395w-154, and Part E contains generally applicable definitions and exclusions, <u>see</u> 42 U.S.C. §§ 1395x – 1395lll.

> "Before 1980, 'Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained.'" <u>Humana Med. Plan, Inc. v. W. Heritage Ins. Co.</u>, 832 F.3d 1229, 1234 (11th Cir. 2016) (quoting <u>Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund</u>, 656 F.3d 277, 278 (6th Cir. 2011)).  "In 1980, in an effort to curb the rising costs of Medicare, Congress enacted the MSPA, which 'inverted that system; it made private insurers covering the same treatment the "primary" payers and Medicare the "secondary" payer.'  Medicare benefits became an entitlement of last resort, available only if no private insurer was liable." <u>Id.</u> (citation omitted). Under the current Medicare system, an automobile insurance provider or a similarly situated entity is the primary payer relative to Medicare or an MAO whenever its policy holders cause Medicare eligible expenses that are within its policy limits. <u>See</u> 42 U.S.C. § 1395y(b)(2)(A).

> In 1986, in an effort to "encourage private parties to bring actions to enforce Medicare's rights" under the MSPA and thereby reduce instances of primary payers failing to cover costs or to reimburse CMS, Congress created the MSPA's private cause of action.  <u>See</u> <u>United Seniors Ass'n v. Philip Morris USA</u>, 500 F.3d 19, 22 (1st Cir. 2007).  The private cause of action provides:

> There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A) [of 42 U.S.C. § 1395y(b)].

> 42 U.S.C. § 1395y(b)(3)(A).  Paragraph (1) contains rules concerning group health care plans and paragraph (2)(A) is a general prohibition on Medicare making

payments for costs that a primary payer, such as Plymouth or a similarly situated auto insurance provider, has paid or is expected to pay. See Humana Med. Plan, 832 F.3d at 1234 (discussing MSPA's statutory structure). MAOs such as Fallon did not exist when the MSPA's private cause of action was enacted, and Congress likely therefore did not anticipate such plans bringing actions like that brought here. The more probable scenario then was Medicare beneficiaries or their healthcare providers suing to recover the costs of services that primary payers declined to cover. See id.[8]

In 1997, Congress enacted Part C of Medicare, the Medicare Advantage program, including the provisions that allowed for the creation of MAOs. See id. at 1235 & n.3 (citing Pub. L. No. 105-33, § 4001, 111 Stat. 251 (codified as amended at 42 U.S.C. §§ 1395w-21 – 1395ww-28)). "Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation that would ultimately create a more efficient and less expensive Medicare system." In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig., 685 F.3d 353, 363 (3d Cir. 2012) (citing H.R. Rep. No. 105-217, at 585 (1997), 1997 U.S.C.C.A.N. 176, 205–06 (Conf. Rep.)). Under the Medicare Advantage program, MAOs administer Medicare benefits pursuant to a contract with CMS, and CMS pays the MAOs a fixed fee per enrollee. An MAO must provide its enrollees at least the same benefits as they would receive under traditional Medicare. See 42 U.S.C. §§ 1395w-22(a), 1395w-23. As of 2018, more than 20 million Americans, comprising 34 percent of Medicare beneficiaries, were enrolled in a Medicare Advantage plan. See Gretchen Jacobson et al., A Dozen Facts About Medicare Advantage, Kaiser Family Foundation (Nov. 13, 2018), https://www.kff.org/medicare/issue-brief/a-dozen-facts-about-medicare-advant age/.

Medicare Part C includes a provision that allows MAOs to charge a primary payer, such as an auto insurance provider that insures a tortfeasor and thereby becomes a primary payer pursuant to the MSPA, or an individual who has received payments from such a primary payer. Specifically, "[o]rganization as secondary payer," provides:

Notwithstanding any other provision of law, a [Medicare Advantage] organization may (in the case of the provision of items and services to an individual under a [Medicare Advantage] plan under circumstances in which payment under this subchapter is made secondary pursuant to section 1395y(b)(2) of this title) charge or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or policy described in such section--

---

[8] The MSPA's private cause of action is not a *qui tam* statute. See United Seniors Ass'n, v. Philip Morris USA, 500 F.3d 19, 25 (1st Cir. 2007). Plaintiffs who bring suit under 42 U.S.C. § 1395y(b)(3)(A) must prove their own damages and the statute "does not contemplate that the plaintiff share with the government in any monetary judgment." Id.

(A) the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services, or

(B) such individual to the extent that the individual has been paid under such law, plan, or policy for such services.

42 U.S.C. § 1395w-22(a)(4).  Although this right to "charge" a primary payer does not itself vest MAOs with a cause of action, CMS regulations provide that an MAO may "exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under" other regulations addressing, *inter alia*, Medicare's right to recover conditional payments made to service providers from primary payers in accordance with the statutory exceptions to 42 U.S.C. § 1395y(b)(2)(a).  42 C.F.R. § 422.108(f); see also Parra v. PacifiCare of Ariz., Inc., 715 F.3d 1146, 1153 (9th Cir. 2013) ("On its face, the MAO Statute does not purport to create a cause of action.").[9]

The cause of action that permits the United States to bring an action "against any or all entities that are or were required or responsible" for payment under the MSPA is unavailable to MAOs.  That government cause of action, however, also permits the United States to recover double damages from secondary payers in accordance with the MSPA's private cause of action.  See 42 U.S.C. § 1395y(b)(2)(B)(iii).  Several courts have reasoned that because the MSPA intended to provide an equal right to MAOs to recover from primary payers and because the government is entitled to recover double damages in accordance with the MSPA's private cause of action, MAOs should also be permitted to pursue claims against primary payers who have failed to reimburse them under that cause of action.  See, e.g., Humana Med. Plan, 832 F.3d at 1234; In re Avandia, 685 F.3d at 363.

This brings us to the next step.  As the Seventh Circuit has explained, "trying to collect these unreimbursed payments can be tedious, costly, and uncertain. This creates an incentive for MAOs to outsource this process—essentially to assign or sell its right to reimbursement to another party."  MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co., 994 F.3d 869,

---

[9] Although "private rights of action to enforce federal law must be created by Congress," Alexander v. Sandoval, 532 U.S. 275, 286 (2001), courts accord considerable weight to executive departments' construction of statutory schemes that fall within their regulatory purview except where "Congress has directly spoken to the precise question at issue."  Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.").

872 (7th Cir. 2021).  MSPRC is such a party.  Assignees of an MAO, like MSPRC, "can identify

unreimbursed conditional payments and successfully bring suit under the [Medicare] Act" and

can "collect twice as much on a particular assigned receivable" due to the Medicare Act's double

damages provision.  Id.  Still, taking on this debt carries the same uncertainties for the assignee

as "it is not always clear which assigned receivables in fact reflect conditional payments [by the

MAO]" and "a third-party assignee may not know at the time of the initial assignment which or

how many conditional payments should actually be reimbursed by a primary payer."  Id.

## C.    Discussion

Under this scheme, MSPRC asserts that it owns the recovery rights to the Medicare lien

for Fallon's A.C. accident-related payments and is therefore entitled to reimbursement in the

amount of $2,059.95, the total Fallon paid for those payments, plus interest ($1,858.71) and

double damages ($3,918.66), for a total of $7,837.32.  [ECF No. 88 at 12, 22].  Plymouth

challenges MSPRC's claim on several fronts, chiefly arguing that MSPRC has not shown that

Fallon paid for any treatments or services for A.C., much less any treatments that were medically

necessary and causally related to the 2012 car accident with Plymouth's insured, meaning that

MSPRC has suffered no injury and therefore has no standing to sue.  [ECF No. 96 at 8–16].

Plymouth also asserts there is no evidence that the A.C. claims were among those assigned to

MSPRC, that the claim is untimely, and that there is no evidence Plymouth had actual or

constructive knowledge of Medicare payments prior to suit.  [Id. at 18–22].

### 1.    Reimbursable Payments

MSPRC contends that it has made the required showing for summary judgment in its

favor, citing Humana Med. Plan, Inc. v. W. Heritage Ins. Co., 832 F.3d 1229 (11th Cir. 2016)

[ECF No. 88 at 21].  It says it has shown: (1) that Plymouth is the primary plan responsible for

the expenses; (2) that Plymouth failed to provide appropriate reimbursement to the secondary

payer, Fallon; and (3) that Fallon paid for accident-related medical expenses.  [ECF No. 88 at

18–25]; see also 42 U.S.C. § 1395y(b)(3)(A); Humana, 832 F.3d at 1234.[10]

Plymouth, in turn, argues that it is entitled to summary judgment because MSPRC has not

provided sufficient evidence to prove: (1) that A.C.'s claims were among the assigned claims

from Fallon to MSPRC; (2) that Fallon made any payments to A.C.'s providers; and (3) that the

treatments and services Plymouth seeks reimbursement for were related to the car accident.[11]

[ECF No. 96 at 10–16, 18–20].

"The Medicare Act may authorize [such a] lawsuit" but this "satisfies only half the

inquiry necessary to establish subject matter jurisdiction[,]" State Farm, 994 F.3d at 871; the

other half is Article III standing, id; see also Spokeo, Inc. v. Robins, 578 U.S. 330, 341 (2016)

("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff

automatically satisfies the injury-in-fact requirement whenever a statute grants a person a

statutory right and purports to authorize that person to sue to vindicate that right.").  To establish

standing for such a claim, a plaintiff must proffer evidence of actual injury in the form of "the

existence of an unreimbursed payment—a concrete right to collect" from defendant, not just "the

---

[10] The First Circuit has yet to address the elements of a private right of action under the Medicare statute, but the Second, Third, and Eleventh Circuits have all held that the MSPA's private cause of action permits an MAO to recover from a tortfeasor.  See Aetna Life Ins. Co. v. Big Y Foods, Inc., 52 F.4th 66, 72–73 (2d Cir. 2022); In re Avandia Mktg., Sales Pracs. and Prods. Liab. Litig., 685 F.3d 353, 358–59, 366–67 (3d Cir. 2012); Humana, 832 F.3d at 1234.

[11] Plymouth also argues that there is no evidence that A.C. was enrolled in an MA plan, but Fallon has provided A.C.'s evidence of coverage, which was in effect during the time of the relevant medical services and treatments and shows that A.C. was enrolled in "Fallon Senior Plan Standard Enhanced Rx HMO a Medicare HMO . . . offered by Fallon Community Health Plan."  [ECF No. 89-2]; see also [ECF No. 89-3 (Plymouth Claim Evaluation/Large Loss Form listing A.C.'s "Health Carrier" as "MEDICARE/Fallon Community Health Plan").

mere existence of an assignment to collect potentially unreimbursed payments." State Farm, 994

F.3d at 874–75 (emphasis omitted).  Plymouth contends that the record is devoid of any evidence

of any reimbursable payment, see [ECF No. 93], and points to MSPRC's own exhibit, [ECF No.

89-6], a table identifying the claims for which it seeks to recover, that indicates that Fallon paid

"0.00" for all medical treatments for A.C. occurring 4/16/2012 through 1/23/2013.  [ECF No. 93

¶¶ 53–54].  Instead, Plymouth argues, it was A.C.'s personal injury insurer, MetLife, who paid

for all of her accident-related medical bills and because her medical bills for the right shoulder

injury were less than the $8,000 threshold for her personal injury insurance, Fallon would not

have paid any of those bills.  [ECF No. 93 ¶¶ 41–52, 72].

    To establish that Fallon did pay for some accident-related treatments and services

rendered to A.C., MSPRC points to various, albeit confusing and largely unexplained, medical

bills (produced by Plymouth) for services rendered to A.C. that reflect that benefits were paid out

by Fallon and the dollar amount paid, see, e.g., [ECF No. 89-7 at 4–6 (medical bills from Dr.

Kathleen O'Grady/Reliant Medical Group naming insurance provider as "FCHP Cap Contractual

Allowance W/O"); ECF No. 89-16 (medical bills from Dr. Gary Peters listing payer as "FHCP

Cap Senior Plan")], and records produced by Fallon that reflect that they were charged and paid

for services rendered to A.C. and the "benefit" amount paid, see, e.g., [ECF No. 89-9].  MSPRC

also relies on the same table identified by Plymouth, [ECF No. 89-6], but explains that the

"PAID_AMT" column reflects zero payments across the board only because the bills were paid

by Fallon pursuant to a capitation agreement with providers that capped payments per

beneficiary at a monthly fee, [ECF No. 104 at 11–15].[12]  Plymouth rightly highlights that neither

---

[12] Plymouth puts forth a bevy of evidentiary challenges to the claims-related exhibits proffered
by MSPRC, namely that they are largely unauthenticated and inadmissible hearsay that should

MSPRC nor Fallon has produced this capitation agreement or even alleged that it has seen the

agreement.  [ECF No. 93 ¶ 67].  Nevertheless, MSPRC proffers sworn testimony from both

Miranda and West explaining that the other data included in the table, which was generated by

Fallon, indicates that the payments were made pursuant to a capitation agreement, and that such

a capitation agreement would have been in place.  See [ECF No. 89-11 (Miranda Decl.) ¶¶ 30–

32; ECF No. 89-12 (West Decl.) ¶¶ 13–19; ECF No. 89-29 (Miranda Dep.) at 130:8–11, 135:15–

136:3].  Additionally, at least some of the medical bills, which were in Plymouth's possession,

also suggest the existence of a capitation agreement.  See ECF No. 89-7 at 4–6 (medical bills

reporting payments by "FCHP CAP Contractual Allowance W/O"); ECF No. 89-16 at 7 (medical

records identifying A.C.'s insurer as "FCHP Capitated Medicare" and "FCHP Cap Senior

Plan")].  Plymouth asks the Court not to consider extrinsic evidence of such a document in place

of the original, based on the Best Evidence Rule, see [ECF No. 101 at 9], but that Rule does

allow courts to consider the content of a writing without the original or a duplicate of the original

---

not be considered.  [ECF No. 96 at 26–27].  The Court agrees that MSPRC's attempts to
authenticate the data, which were generated by Fallon, through Miranda's testimony are
unavailing, as is its attempt to establish through Miranda's testimony that the documents are
admissible under the business records exception to the hearsay rule.  See [ECF No. 89-11
(Miranda Decl.)].  Nevertheless, "a district court may consider hearsay evidence submitted in an
inadmissible form at the summary judgment stage where the content of the evidence proffered
could later be provided in an admissible form at trial[.]"  Edwards v. Granite Telecomms., Inc.,
No. 19-cv-12330, 2022 WL 974049, at *2 (D. Mass. Mar. 31, 2022) (quoting SEC v. Ramirez,
No. 15-cv-02365, 2018 WL 2021464, at *15 (D.P.R. Apr. 30, 2018)).  Considering that
Plymouth has already submitted the affidavit of a Fallon employee, it is plausible that the claims
data could be provided in an admissible form at trial through the testimony of a Fallon employee,
even if some of their contents may be still excluded as hearsay.  See HMC Assets, LLC v.
Conley, No. 14-cv-10321, 2016 WL 4443152, at *3–4 (D. Mass. Aug. 22, 2016) ("'It is well
established that the [qualified] witness need not be the person who actually prepared the record'
. . . [and is] only required to have some familiarity and ability to explain the maintenance of the
business records in question, especially when elements of trustworthiness are present.") (quoting
Wallace Motor Sales, Inc. v. Am. Motors Sales Corp., 780 F.2d 1049, 1061 (1st Cir. 1985)
(further citations omitted)).

where, as MSPRC purports here, [ECF No. 107 at 8, n.2], the original has been lost or destroyed

with no bath faith, see Fed. R. Evid. 1001–1004; Airframe Sys., Inc. v. L-3 Commc'ns Corp.,

658 F.3d 100, 107 (1st Cir. 2011).  While the Court shares Plymouth's skepticism of the

persuasiveness of this evidence, it cannot conclude that, when viewed in the light most favorable

to MSPRC, there is no dispute of fact as to whether a capitation agreement existed between

Fallon and the provider that would explain the data at issue.[13]

Second, to the extent Plymouth disputes charges related to A.C.'s wrist pain and carpal

tunnel surgery as unrelated to the accident, MSPRC represents that it is no longer seeking

recovery for these claims.  [ECF No. 105 ¶¶ 30–31].  The remaining claims that MSPRC seeks to

recover for are related to a right shoulder injury, which Plymouth has not specifically challenged

as unrelated to the accident.  Further, there is at least some evidence in the record that suggests

that the claims for which MSPRC is currently seeking recovery were identified by providers as

related to the accident.  See [ECF No. 104 at 16–17 (citing ECF Nos. 89-7, 89-15) (referring to

an email from Plymouth's adjuster to A.C.'s son that identifies the accident-related bills

according to A.C.'s medical provider)].  MSPRC also points to evidence in the record that it is

seeking recovery of claims that were not, in fact, paid by MetLife.  A.C.'s medical records from

Reliant Medical Group reflect that some 2012–2013 payments were made by "MVA

---

[13] Plymouth further argues that it would be entitled to summary judgment even if such a capitation agreement existed because such an agreement would pluck MSPRC's claims from under the umbrella of the MSPA and render it a matter of private contract enforcement, citing Tenet Healthsystem GB, Inc. v. Care Improvement Plus S. Cent. Ins. Co., 875 F.3d 584, 591 (11th Cir. 2017), [ECF No. 101 at 9–10], but Plymouth's reliance on Tenet is misguided.  When the Tenet court stated that "[a] contract provider's claims are determined entirely by reference to the written contract," it described actions that arise from a dispute between the parties to that contract, the MAO and the healthcare provider, Tenet Healthsystem GB, Inc., 875 F.3d at 591, not as here, between the primary plan and an MAO, who share no contractual privity and whose rights to recovery are exclusively governed by the MSPA.

Insurance[,]" [ECF No. 89-7 at 2–3], indicating a motor vehicle insurer like MetLife, and others were paid by "FHCP Cap Contractual Allowance W/O[,]" [id. at 4–6]; see also [ECF No. 104 at 27–28; ECF Nos. 93-21, 93-22 (MetLife payment records)].

Plymouth also contends that it is entitled to summary judgment because MSPRC cannot prove that A.C.'s claims were among those assigned to it as they may have been subject to the "carve-out" period set forth in the first assignment agreement between MSPRC and Fallon. [ECF No. 93 ¶¶ 17–18]. The first agreement excluded claims that originated in the two years prior to the assignment, which was executed on June 19, 2017. [ECF No. 93-10]. Relying on the date on which CMS was notified of the settlement, in or around August 27, 2015, Plymouth argues that the A.C. claims fall within the carve-out window that began on or around June 19, 2015. [ECF No. 96 at 20–22]. Plymouth points to several cases where courts have rejected MSPRC's lawsuits where the assignment had carve-out language because it did not provide evidence that could plead or prove that the exemplar claim was among those assigned by the MAO, [id. at 20, n.22], but, perhaps having now learned better, MSPRC has done so here—albeit just barely. West testified "that the A.C. claim is an Assigned Claim because of the dates of services asserted by [MSPRC] fall within the Assigned Period[,]" [ECF No. 89-12 ¶ 9], and further that, in any event, the second assignment, effective June 29, 2019, assigned to MSPRC "any and all of Fallon's recovery claims encompassing dates of service up to and including June 29, 2019" such that "[a]ll claims not assigned [by the first assignment] are now considered assigned under the [s]econd[,]" [id. ¶¶ 11–12]. In light of this testimony, the record before the Court is distinguishable from those cases cited by Plymouth that dismissed MSPRC's claims. See, e.g., MSP Recovery Claims, Series LLC v. Aix Specialty Ins. Co., No. 18-cv-01456, 2020 WL 5524854, at *11 (M.D. Fla. Aug. 10, 2020) (granting summary judgment for defendant

where plaintiff did not produce any evidence that the exemplar claim fell within the assignment, such as "an affidavit from [the assigner] or one of their own corporate representatives attesting to the fact that the [exemplar] Claim was not previously assigned to a different recovery vendor").

Because the Court finds that genuine disputes of material fact remain as to whether Fallon did, in fact, pay any providers for treatments and services rendered to A.C. as a result of the car accident, whether those payments were related to medical treatments and services stemming from the April 2012 accident, and whether A.C.'s claims were among those ultimately assigned to MSPRC, summary judgment is inappropriate on these grounds.

### 2.    Timeliness

Plymouth further contends that it is entitled to summary judgment because the claim is untimely.  [ECF No. 96 at 20–22].  The parties seem to agree that that a three-year statute of limitations applies, 42 U.S.C.§ 1395y(b)(2)(B)(iii), but dispute when the clock starts running. The MSPA provides that:

> An action may not be brought by the United States under this clause with respect to payment owed unless the complaint is filed not later than 3 years after the date of the receipt of notice of a settlement, judgment, award, or other payment made pursuant to paragraph (8) relating to such payment owed.

42 U.S.C. § 1395y(b)(2)(B)(iii); see also MSPA Claims 1, LLC v. Bayfront HMA Med. Ctr., LLC, No. 17-cv-21733, 2018 WL 1400465, at *6 (S.D. Fla. Mar. 20, 2018) (finding that the MSPA clearly "sets forth a timeframe in which the Government must request reimbursement"). Plymouth contends that the clock started running on either the date of A.C.'s settlement with Plymouth, April 6, 2015, or the date CMS had notice of the settlement, August 27, 2015, which would have put Fallon on inquiry notice of the settlement because it had access to that data. [ECF No. 96 at 22].  Plymouth further avers that since April 6, 2015 was more than three years before the complaint was filed on August 13, 2018 and because August 27, 2015 fell within the

two-year carve-out of excluded claims, under either date, the claim is barred.  [Id.].  MSPRC disagrees, asserting that the statute of limitations is triggered by "receipt of [actual] notice of settlement," [ECF No. 104 at 25 (alteration in original) (quoting 42 U.S.C. § 1395y(b)(2)(B)(iii)], and, given that there is no evidence on the record that Plymouth ever directly notified Fallon or MSPRC of the settlement, the soonest Fallon or MSPRC could have been on notice would have been at the time of assignment in 2017, well within the three-year period.  [ECF No. 104 at 18–19, 21].

The plain language of § 1395y(b)(2)(B)(iii) makes clear that the limitations period is triggered by notice of settlement.  See, e.g., Bayfront HMA, 2018 WL 1400465, at *6; MSP Recovery Claims, Series LLC v. Grange Ins. Co., 19-cv-00219, 2019 WL 6770729, at *25 (N.D. Ohio Dec. 12, 2019); Hartford Fin. Servs. Grp., 2022 WL 3585782, at *8.  Accordingly, the date of settlement (here, April 6, 2015) is irrelevant.  Moving on, while some courts have rejected Plymouth's "notice-by-access argument," see MSPA Claims 1, LLC v. Tower Hill Prime Ins. Co., No. 18-cv-00157, 2021 WL 1041662, at *3 (N.D. Fla. Jan. 7, 2021) (finding that access to CMS data does not strictly meet the statutory language requiring "receipt" of notice, especially where such access is not required by statute or regulation), others have found it persuasive, see MSP Recovery Claims, Series LLC v. Farmers Ins. Exch., No. 17-cv-02559, 2019 WL 3500285, at *3 (C.D. Cal. Aug. 1, 2019) (holding that "the statute of limitations begins to run when CMS, not an MAO, is provided with notice"); see also Hartford Fin. Servs. Grp., 2022 WL 3585782, at *8.

The Court need not make a finding in this regard.  Even if the Court did adopt Plymouth's reasoning on this point, the reporting date of August 27, 2015 would not automatically bar the claim as it falls within the three-year limitations period and the Court has

already found that the record as it stands can reasonably support finding that the A.C. claims

were not among those excluded by the assignment agreement's two-year carve-out.[14]

        3.    <u>Notice and Reporting Requirements</u>

Finally, Plymouth asserts that it is entitled to summary judgment because MSPRC has not

proven its compliance with certain regulatory provisions.  The regulations provide, in pertinent

part:

> (b) Responsibilities of the MA Organization. The MA organization must, for each
> MA plan—
>> (1) Identify payers that are primary to Medicare under section 1862(b) of
>> the Act and part 411 of this chapter;
>> (2) Identify the amounts payable by those payers; and
>> (3) Coordinate its benefits to Medicare enrollees with the benefits of the
>> primary payers, including reporting, on an ongoing basis, information
>> obtained related to requirements in paragraphs (b)(1) and (b)(2) of this
>> section in accordance with CMS instructions.

42 C.F.R. § 422.108(b).

> (c) The primary payer must make payment to either of the following:
>> (1) To the entity designated to receive repayments if the demonstration of
>> primary payer responsibilities is other than receipt of a recovery demand
>> letter from CMS or designated contractor.
>> (2) As directed in a recovery demand letter.

42 C.F.R. § 411.22(c).  To this end, Plymouth contends that it had no knowledge prior to

settlement that Fallon was owed any reimbursement.  [ECF No. 96 at 4, 16–18]; <u>see</u> <u>MSP</u>

<u>Recovery Claims, Series LLC v. ACE Am. Ins. Co.</u>, 974 F.3d 1305, 1319 (11th Cir. 2020)

---

[14] Plymouth also suggests that evidence of a phone call between claims representatives is enough
to demonstrate that Fallon had actual notice of Plymouth's role as insurer as early as January
2013, <u>see</u> [ECF No. 96 at 22], but there is nothing in the record that suggests anything about this
call that would have put MSPRC on notice of a settlement that followed two years later.
Moreover, the cause of action does not even begin to accrue under the statute until 60 days after
settlement.  A statute of limitations period cannot begin to run before the cause of action is
complete.  <u>See</u> <u>Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson</u>, 545 U.S.
409, 418 (2005).

("[P]rimary payers must have knowledge that they owed a primary payment before a party can claim double damages under the [MSPA][.]" (citations omitted)).

First, contrary to Plymouth's assertions, the latter provision does not require plaintiffs to submit a pre-suit demand letter, but merely indicates that a primary payer's liability arises either directly from a demand letter or from some other demonstration of primary payer responsibilities, such as a settlement.  See ACE, 974 F.3d at 1319.[15]

Second, as already discussed above, there are genuine disputes of material fact on the record regarding whether Plymouth knew or should have known whether Fallon's MA plan paid any bills for A.C.'s accident-related coverage, including whether Fallon's communications with Plymouth and the medical records in Plymouth's possession, however limited they may have been, were sufficient to put Plymouth on notice that Fallon made payments.  See [ECF No. 89-3 (Plymouth Claims Evaluation/Large Loss Form listing A.C.'s "Health Carrier" as "MEDICARE/Fallon Community Health Plan"); ECF No. 89-18 (Plymouth's claims notes indicating that Fallon inquired in January 2013 about the status of settlement, if any, between Plymouth and A.C.); ECF No. 89-30 (Plymouth Dir. of Claims Dep.) at 78:6–11; 88:23–89:4]; see also [ECF No. at 18–23].  There are no additional actions that Fallon or MSPRC must allege

---

[15] At the request of the Ace court, the Department of Health and Human Services submitted an Amicus Brief that explained:

> the defendants appear to misunderstand the regulations governing their repayment obligations, asserting that the requirement to reimburse Medicare is not triggered unless Medicare sends a demand letter. This is incorrect. The requirement is triggered whenever the primary plan has constructive knowledge of a payment. Constructive knowledge is established when a defendant 'has in its possession information necessary to draw the conclusion that Medicare has made such a payment' or 'willfully blinds itself' to such information.

[ECF No. 104-1 at 18 n.4. (internal citations omitted)].

or prove as a prerequisite to suit.  See DaVita Inc. v. Virginia Mason Mem'l Hosp., 981 F.3d 679, 687 (9th Cir. 2020) ("Nothing in the statutory text [of the MSPA's private cause of action] concerns an act or omission by Medicare. Indeed, the text does not mention Medicare at all; it merely authorizes suit whenever a primary plan fails to make an appropriate payment.").

Given that the record is replete with genuine disputes of material fact, the motions for summary judgment shall be denied.

## IV.     MOTION TO DROP PARTIES

Finally, the Court turns to MSPRC's motion to drop parties.  [ECF No. 90].  MSPRC filed this motion, which seeks to drop plaintiff Series 17-04-631 and defendant The Plymouth Rock Company, Inc. as parties from the action, [id.], concurrent with its motion for summary judgment.  Plymouth only opposes the motion to the extent it seeks to dismiss the parties without prejudice and dismissal is limited only to the A.C. exemplar claim, rather than all the claims asserted in the original complaint.  [ECF No. 99]; see also [ECF No. 90 at 3, n.1].

MSPRC named The Plymouth Rock Company, Inc. as a defendant in this suit because it believed that Plymouth had potentially engaged "in a shell game" where the entity reporting settlement to CMS would not be the entity who signed the settlement.  [ECF No. 90 ¶ 6].  Discovery has proven this to be false.  The Plymouth Rock Company, Inc. was not a party to the settlement agreement.  [Id. ¶ 7; ECF No. 99 ¶ 10].  Notwithstanding MSPRC's invocations of Federal Rules of Civil Procedure 21 and 41(a)(2) (governing Misjoinder and Nonjoinder of Parties and Dismissal of Actions by Court Order, respectively), defendant Plymouth Rock Company, Inc. and all claims alleged against it shall be dismissed with prejudice because, as stated in Plymouth's motion for summary judgment, it is not an insurance provider and cannot be

liable as a primary plan under the MSPA.  <u>See</u> [ECF No. 96 at 24–25]; 42 USC §

1395y(b)(2)(A)(ii) (defining "primary plan").

The Court previously found that MSP Recovery Claims, Series LLC has the right to

pursue claims arising from the rights assigned to its series, Series 17-04-631, under its limited

liability agreement.  [ECF No. 26 (Memorandum and Order on Defendants' Motion to Dismiss)

at 9–11]; <u>see also</u> [ECF No. 90 ¶ 3].  Presumably, now that it is secure in its knowledge that the

Court agrees that MSP Recovery Claims, Series LLC has standing, MSPRC seeks to drop Series

17-04-631 as plaintiff to "streamline" the case.  [ECF No. 90 ¶¶ 2, 9].  Plymouth does not oppose

this action.  In fact, it argues that Series 17-04-631 "has no right to sue or recover for those assets

because such rights were maintained by MSP Recovery Claims, Series LLC as the 'Master

Series LLC.'"  [ECF No. 96 at 23–24].  MSPRC does not respond to this argument, [ECF No.

104 at 33], and the Court need not address it.  "The grant or denial of a motion to bring in or to

drop a party lies in the discretion of the judge."  <u>In re iBasis, Inc. Derivative Litig.</u>, 551 F. Supp.

2d 122, 127 (D. Mass. 2008) (citing 7 Charles Alan Wright & Arthur R. Miller, Federal Practice

and Procedure § 1688 (3d ed. 2022)).  Considering the positions and interests of the parties,

plaintiff Series 17-04-631 will be dismissed as a party.

## V.    CONCLUSION

For the foregoing reasons, the motions for summary judgment, [ECF Nos. 88, 91], are

<u>DENIED</u>.  Plymouth's motion to strike, [ECF No. 103], and MSPRC's motion to drop parties,

[ECF No. 90], are both <u>GRANTED</u> in part and <u>DENIED</u> in part.

The parties shall appear before the Court for a status conference on April 5, 2023 at 10:00

a.m. by remote proceeding.

**SO ORDERED.**

March 24, 2023                                    /s/ Allison D. Burroughs
                                                 ALLISON D. BURROUGHS
                                                 U.S. DISTRICT JUDGE